**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Estate of Carl Clutters,

       Plaintiff,

    v.                               Case No. 1:05cv223

Tim Sexton, *et al.*,                Judge Michael R. Barrett

       Defendants.

## OPINION & ORDER

This matter is before the Court upon Defendants' Motion for Summary Judgment (Doc. 56) and Plaintiff's Motion for Partial Summary Judgment (Doc. 57). The Parties have filed their respective Responses (Docs. 66, 67, 73) and Plaintiff has filed a Reply in support of its Motion (Doc. 71). This matter is now ripe for review.

## I.    BACKGROUND

This action is brought on behalf of Carl Clutters. Plaintiff, the Estate of Carl Clutters, brings claims under 42 U.S.C. §§ 1983, 1985 for violations of Clutter's constitutional rights and violations of Ohio law.   (Doc. 28)

On September 2, 2004, Clutters pled no contest to several violations of Ohio law which were related to driving under the influence. Clutters was sentenced to 60 days in the Lawrence County Jail ("the Jail"). Clutters was booked into the Jail on September 23, 2004. (Doc. 86, Richard Slack Depo. at 28) Upon booking, Defendant Deputy Richard Slack took a medical history and noted that Clutters had 18 inches of his small intestine and one-half of his pancreas removed. (Id. at 41) Deputy Slack remembers that Clutters was

quiet and "talked real slow." (Id. at 32)  Clutters reported that he was five-foot-ten and weighed 130 pounds. (Id. at 36)

As a result of his previous surgery, Clutters' physician prescribed OxyContin and OxyCodone to manage his pain. (Doc. 57, Ex. A)  On September 23, 2004, Clutter's wife took his prescription medications to the jail. (Doc. 81, Paula Clutters Depo. at 38-39)  There appears to be no dispute that among the prescriptions Clutters' wife brought to the jail was a prescription for OxyContin. (Id. at 39-40; Doc. 83, Ray Jones Depo. at 102-103)

Clutters had been prescribed 60mg of OxyContin every eight hours. (Doc. 57, Ex. A)  Clutters was to receive this medication by receiving one 40mg pill and one 20mg pill every eight hours. (Id.)  However, Clutters had run out of the 40mg pills approximately five days before his incarceration was to begin, and it was not yet time to refill this prescription. (Clutters Depo. at 44-45)  Therefore, Clutters' wife only brought the 20mg pills to the jail. (Id. at 39-40)[1]

It was the policy of the Jail for the medical officer or nurse to blister pack the medication for a particular inmate. (Doc. 87, Robert Van Keuren Depo. at 41-42)[2]  When it was time for medication to be dispensed, the deputy on duty would take the blister pack to the cell door. (Id. at 40-41)  Both the inmate and the deputy sign off on the medication being received. (Id.; Slack Depo. at 42-43)  The deputy opens the blister pack, and gives the medication to the inmate. (Id.)  The inmate must then demonstrate to the deputy that

---

[1]Defendants argue that because only 20mg pills were available, Defendants were limited to dispensing that dosage to Clutters.  However, there is nothing in the record which indicates that it was not possible to give Clutters three 20mg pills in order to reach his prescribed dosage.

[2]It is not clear from the record whether there was a nurse employed at the Jail during this time period. (Van Keuren Depo. at 42)

the medication was swallowed. (Id.) If a inmate refuses their medication, this information is recorded on the medication sheets. (Jones Depo. at 94) The medication sheets for Clutters are missing. (Id. at 210-13)

On September 29, 2004 Dr. Canos, the jail physician employed by the Lawrence County Jail, examined Clutters after Clutters complained of stomach cramps and nausea. (Doc. 90, Dr. Canos Depo. at 49-50) Dr. Canos recalls issuing an order by phone the day before instructing that Clutters was not to receive OxyContin after that day. (Id. at 67-68)[3] Dr. Canos was aware that Clutters had undergone some type of pancreatic surgery and had part of his small intestine removed; and that he had been prescribed OxyContin as a result of the surgery. (Id. at 12, 53)

After examining Clutters, Dr. Canos concluded that Clutters was having OxyContin withdrawal. (Id. at 62) Dr. Canos issued a prescription for Librium and Vistaril, which are anti-anxiety drugs which Dr. Canos uses to calm prisoners going through drug withdrawal. (Id. at 63-64)[4] These drugs do not treat pain. (Id. at 64) Defendant Deputy Ray Jones was

---

[3]There is an order from Dr. Canos, signed on September 29, 2004, stating "when meds are done start on Librium & Vistarel [*sic*]l" and at the bottom "cont[inue] meds." (Doc. 73, Ex.Q) In his deposition, Dr. Canos explained that the instruction "when meds are done start on Librium & Vistaril" was the oral order that he had given the day before. (Canos Depo. at 74) Dr. Canos explained that the statement "when meds are done," meant "go ahead and give him the medicine for that day, and then start with the Librium and Vistaril." (Id. at 67) Dr. Canos explained further that the instruction at the bottom to "continue meds" was referring to the Librium and Vistaril. (Id. at 73) Deputy Jones had a different understanding of Dr. Canos' order. Deputy Jones has testified that it was his understanding that Clutters was to take his OxyContin until it was "done," and therefore Clutters would be taking OxyContin after September 29, 2004. (Jones Depo. at 178-180) While there is testimony in the record that Clutters was given medication on the night of October 2, 2004, there is nothing in the record which shows what that medication was because of the missing medication sheets. (See Jones Depo. at 85, 133)

[4]Dr. Canos testified that the symptoms of withdrawal of OxyContin include insomnia, abdominal cramps, nausea, vomiting, restlessness, confusion, and the sensation that bugs are crawling on the skin. (Canos Depo. at 34-35) Dr. Canos testified that in his private practice, he

present during the examination, and Dr. Canos informed him that Clutters was going through OxyContin withdrawal.  (Id. at 51, 62)  Dr. Canos testified that Deputy Jones was responsible for carrying out his orders.  (Id. at 81)  Deputy Jones was the medical officer for the Jail.  (Jones Depo. at 48)  Deputy Jones was a trained paramedic.  (Id. at 25)

According to Defendants, on the evening of October 2, 2004, Clutters began to act irrationally.  (VanKeuren Depo. at 40-41; Slack Depo. at 47-50)  Clutters yelled, complained of bugs crawling on him, made lewd gestures, and stated that "he did not have any razors." (Id.)  Deputy Slack testified that no one had asked him for a razor, and he did not know why Clutters would have been saying that he had bugs on him.  (Slack Depo. at 47, 54) At this time, Clutters was naked.  (Id. at 53)  Deputies Slack and VanKeuren placed Clutters in the "tank" out of concern for his safety, and to keep him from disrupting other prisoners.  (VanKeuren Depo. at 160; Slack Depo. at 47)[5]  Clutters continued to yell and banged on the door of the tank several times.  (Slack Depo. at 47)  According to Defendants, Clutters calmed down, and was given medication around 8:30 p.m.  (Van Keuren Depo. at 74, 177; Slack Depo. at 55)

This was the first time that it was necessary to restrain Clutters during his time at the Jail.  (Slack Depo. at 56)  Deputy Van Keuren testified that before the night of October 2, 2004, Clutters had acted "like any other inmate," with the exception that Clutters would yell for one of the deputies and ask for his medication before it was time for it to be distributed.

_____

has referred several patients to inpatient treatment clinics for treatment during their withdrawal from OxyContin.  (Id. at 42)

[5]The "tank" is a separate cell with concrete floors, concrete benches, and a steel door. (VanKeuren Depo. at 176)

(Van Keuren Depo. at 120-21, 127) However, Van Keuren explained that other than being "borderline pushy" in asking for his medication, Clutters "seemed like a nice guy." (Id. at 126) Deputy Jones also recalls Clutters yelling for his medication. (Jones Depo. at 82)

While in the tank, Defendants maintain that Clutters again stated that bugs were crawling over him. (Id. at 177) Deputy Van Keuren asked Clutters if he would like to take a shower, to which Clutters responded yes. (Id.) Deputy Van Keuren testified that Clutters walked to the shower on his own. (Id. at 181) Once in the shower, Clutters yelled that he wanted to get out and started banging on the shower door. (Id. at 182; Slack Depo. at 58) Clutters was removed from the shower, but was not given the opportunity to dry off. (Slack Depo. at 63) Clutters was instead escorted back to the tank by Deputies VanKeuren, Slack, and Williams. (VanKeuren Depo. at 183; Slack Depo. at 62-65) Defendants maintain that Clutters was combative and trying to pull away from the officers. (VanKeuren Depo. at 185; Slack Depo. at 59-61) Defendants maintain that while Clutters was being placed in the tank, Deputy Slack lost his grip on Clutters, Clutters slipped and fell, striking the back of his head on the concrete floor. (Slack Depo. at 48-49, 66) Deputy Slack noticed a small amount of blood where Clutters had hit his head. (Id. at 49)

According to Plaintiff, Clutters did not accidentally fall. Plaintiff relies upon video of Clutters being returned to the tank, and argues that Clutters was either pushed into the holding cell or Defendants intentionally released him while he was pulling away. (Doc. 57, Ex. O)[6]

---

[6]The video evidence also includes footage of Clutters' initial entry into the tank. (Doc. 70, Ex. J) The video shows Clutters either being pushed or falling towards the bench in the tank. One of the deputies then enters the tank, leans toward Clutters with a finger raised near Clutters' face, and talks to Clutters. However, Deputy Van Keuren testified that he did not push

Deputy Slack called the EMS to the Jail to examine the cut on the back of Clutters'
head.  (Slack Depo. at 66)   Deputy Van Keuren testified that any time there is a head
injury, the deputies call the EMS. (Van Keuren Depo. at 199)   A paramedic, Richard
Chandler, and an EMT, Brandon Mealey, arrived on the scene and determined that the
bleeding was controlled and the cut did not need stitches.  (Doc. 80, Richard Chandler
Depo. at 31)  Chandler and Mealey did not bandage the cut.  (Id.)  Defendants maintain
that Deputies Slack and Van Keuren were forced to hold Clutters while he was being
examined.  (VanKeuren Depo. at 196)  However, Chandler testified that the deputies were
holding Clutters to assist him to the front area, instead of restraining him.  (Chandler Depo.
at 27)  Chandler testified that Clutters was not combative.  (Id. at 74-75)  Mealey testified
that Clutters was acting "bizarre" but does not recall Clutters being hostile.  (Doc. 85,
Brandon Mealey Depo. at 27)  Chandler testified that a female deputy told him that Clutters'
OxyContin medication had been reduced from 60mg to 20 mg, and Clutters was going
through withdrawal.  (Id. at 34, 63)  Chandler testified that Clutters appeared conscious,
alert, and oriented to person, place and time.  (Id. at 66, 120)

Chandler and Mealey testified that it was not their decision to not transport Clutters.
(Id. at 26, 106; Mealey Depo. at 61, 80)  Instead, the decision was made by the Sheriff's
Department based on the conversations between the deputies and the EMS.  (Chandler
Depo. at 26)  Chandler testified that these conversations were limited to whether Clutters'
cut needed stitches.  (Id. at 123)  Deputy Amanda Efaw signed a "refusal to transport" form
provided by the paramedics.  (Doc. 73, Ex. P)  Deputy Efaw testified that she did not review

Clutters into the tank.  (Van Keuren Depo. at 175)

the form with Clutters, even though he was capable of reading and signing the document. (Efaw Depo. at 150, 155)  Deputy Efaw also testified that she did not read the form before she signed it, but she knew that signing it meant that the paramedics were not going to take Clutters to the hospital.  (Id. at 148-49)  Chandler testified that Clutters did not request to be transported to a medical facility.  (Chandler Depo. at 120)

Clutters was then returned to the tank.  (Van Keuren Depo. at 202-203)  Deputy Slack testified that Clutters was still being belligerent and yelling.  (Slack Depo. at 40) Shortly thereafter, Clutters was removed from the tank so that it could be used for an incoming prisoner who was intoxicated.  (Van Keuren Depo. at 205)  Clutters was handcuffed behind his back and placed into a restraint chair.  (Id. at 205, 216)  Deputy Slack testified that at first Clutters was still yelling, but eventually he calmed down.  (Slack Depo. at 49)  Clutters remained in the restraint chair from 8:40 p.m. until 10:10 p.m.  (Van Keuren Depo. at 205, 213)  At that time, Clutters was returned to the tank, which was now empty.  (Id. at 213; Slack Depo. at 77)  The deputies removed the handcuffs, and laid Clutters on the floor of the tank.  (Van Keuren Depo. at 215-16; Slack Depo. at 76-77) Deputies Van Keuren and Slack testified that they watched Clutters on the closed circuit television, and also watched him through the pan hole of the door at regular intervals.  (Van Keuren Depo. at 218-19; Slack Depo. at 77-78)  Clutters did not get up from the floor, but Deputies Van Keuren and Slack testified that they could see Clutters' chest rising and falling as he breathed, and they could hear Clutters snore.  (Van Keuren Depo. at 219, 221; Slack Depo. at 78)  At approximately 1:50 a.m., Deputy Van Keuren went into the tank to check on Clutters, and found him unresponsive.  (Van Keuren Depo. at 222)  The EMS was again called to the jail, and Clutters was transported to the hospital.  (VanKeuren Depo. at

228-29; Slack Depo. at 81) After he was placed on life support and determined brain dead, Clutters was declared officially dead at 11:08 a.m. (Doc. 56, Ex. C) The coroner determined that Clutters died as the result of a left epidural hematoma due to a fracture of the left temporal parietal skull due to blunt impacts to his head. (Doc. 57, Ex. F) The coroner's report shows that there is no evidence of OxyContin in Clutters' system. (Id.) A death investigation by the state police shows that there were forty-three 20mg OxyContin pills among the medications which accompanied Clutters to the hospital from the Jail. (Doc. 56, Ex. C)[7]

In its Amended Complaint, Plaintiff claims that Defendants violated Plaintiff's constitutional rights by (1) denying medical care for Clutters' head injury; (2) denying medical care by failing to provide his prescribed Oxycontin; (3) using excessive force by intentionally pushing Clutters; (4) using cruel and unusual punishment by forcing him to remain nude; (5) using cruel and unusual punishment by forcing him to into a restraining chair; (6) promulgating and enforcing an unconstitutional custom or policy that creates a blanket prohibition of prescribed medication; and (7) failing to properly train deputies. (Doc. 28) Plaintiff also brings state law claims of assault and battery, intentional infliction of emotional distress, abuse of process, and wrongful death. (Id.)[8]

Plaintiff's claims are brought against Tim Sexton, who is the Lawrence County

---

[7]Defendants point out that this evidence shows that there were 21 pills missing. Defendants argue that this number correlates to the seven-day period between Clutters' booking into the Jail, and his visit to Dr. Canos. Defendants argue that this demonstrates that Clutters was given his medication during that period of time.

[8]Plaintiff also brings claims of "recklessness," "denial of medication," and "denial of medical treatment." Instead of analyzing these as separate claims, the Court construes these claims as being elements of the other claims plead.

Sheriff; George Patterson, Doug Malone, and Jason Stephens, who are Lawrence County Commissioners; Jeff Lawless, who is the Administrator of the Lawrence County Jail; Robert Van Keuren, Andrew Sissler, Scott Williams, Richard Slack, Ray Jones, Robert Bowles, Chad Bowman, and Amanda Efaw, who are Lawrence County Deputies; and Alisha Milliston, who is an employee of the Lawrence County Jail.  Plaintiff also brings its claims against John Doe Companies, John Doe Sheriff Departments, John Doe Lawrence County Deputies, John Doe Government Entities, and John Doe Government Employees. Plaintiff's claims are brought against all of these defendants in both their individual and official capacities.

Plaintiff's Motion for Partial Summary Judgment addresses Plaintiff's section 1983 claim based upon Defendants' denial of medical treatment.  Defendants' Motion for Summary Judgment is directed toward all of Plaintiff's claims.

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita*, 475 U.S. at 587.

However, the nonmoving party may not rest on the mere allegations in the pleadings. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

**B.**   **Section 1983**

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere.  *Tuttle v. Oklahoma City*, 471 U.S. 808 (1985). Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights.  *Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 351 (6th Cir. 2001), *citing Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) *and United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir.1992).[9]

There appears to be no dispute that Plaintiff has shown state action, and instead, the Parties' arguments focus on whether there is sufficient evidence of a constitutional violation.

**C.**   **Liability of County**

Defendants argue that the claims brought against them in their official capacity must fail because Plaintiff has not shown any evidence of an unconstitutional policy or custom.

Suits against county officials in their official capacity should be treated as suits

---

[9]42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

against the county. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). A municipality or county cannot be held liable under section 1983 for an injury inflicted solely by its employees or agents. *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 441 (6th Cir. 2000), *citing Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). For liability to attach, the plaintiff must establish that the county engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights. *Powers v. Hamilton County Public Defender Com'n*, 2007 WL 2428315, *11 (6th Cir. Aug. 29, 2007) (slip op.), *citing Monell*, 436 U.S. at 694; *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996). A policy includes "a policy statement, ordinance, regulation, or decision officially adopted and promulgated . . . ." *Id.*, *citing Monell*, 436 U.S. at 690. In contrast, a custom "has not received formal approval through . . . official decisionmaking channels." *Id.*, *citing Monell*, 436 U.S. at 690-91. A section 1983 plaintiff may establish the existence of a custom by showing that policymaking officials knew about and acquiesced in the practice at issue. *Id.*, *citing Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004).

Plaintiff points to two policies or customs that the County engaged in: (1) a blanket prohibition of prescribed OxyContin and other narcotics; and (2) a failure to properly train deputies.

### 1. Prohibition on prescribed narcotics

Plaintiff argues that the County has banned all narcotics, regardless of a prescription, in the Lawrence County Jail.

The Court finds that Plaintiff has presented sufficient evidence to show there was either a policy or custom of prohibiting narcotics in place at the Lawrence County Jail at the

time of Clutters' death.

During his deposition, Dr. Canos testified:

Q:     All right. But -- But what you're saying is that there's a drug -- a drug policy in the Lawrence County Jail that was in effect during Mr. Clutters' incarceration from September 23 to October 3, 2004, correct?

A:     That's been in place for the last several years.

Q:     It was in place when Mr. Clutters was in jail, correct?

A:     Yes, sir.

Q:     All right.  And is that a written policy?

A:     It's a drug -- It's a written drug policy.

Q:     So it is a written policy that the sheriff has adopted?

A:     Yes, sir.

Q:     So sheriffs -- The sheriff of Lawrence County has adopted a policy --

A:     I adopted -- That's my policy that I adopted, that no narcotics are allowed in.

Q:     Even if the -- the treating physician has prescribed it to the inmate for his medical care as a result of chronic pain, such as Oxycontin, correct?

A:     Correct.

Q:     Is that a written policy with the Lawrence County Sheriff's Department, this drug policy?  Excuse me?

A:     Yes, sir.

Q:     And where would that be in writing?

A:     It would be in writing in the Lawrence County Jail.

Q:     Did the sheriff of Lawrence County – did he affirm and approve that particular drug policy where no prescribed or unprescribed narcotic medication will be permitted for inmates to take in the Lawrence

County Jail, which would involve Carl Clutters?

A:      Correct.

(Canos Depo. at 70-72)  Dr. Canos testified further that he had signed a written listing of prescription and nonprescription medications permitted for use in the Jail.  (Id. at 95) However, Chief Deputy Lawless testified that no such written policy exists:

Q:      And, in fact, there is no written policy at the Lawrence County Jail that prohibits narcotics such as OxyContin, correct?

A:      Can I refer to the policy real quick?

Q:      Absolutely.  And just let me know which page you're referring to, if you find something.

A:      Okay.  On the 1322, Page 1322, number D or letter D is the only thing I can refer to which just says: The jail physician must establish and maintain a listing of prescription and nonprescription medications for use in the facility.  Now, again, I don't have that list other than this fact that Dr. Kanoes [*sic*] can say what can and cannot come in or give instances.

 . . .

Q:      And in your employment with the Lawrence County Jail, at no time have you ever seen a listing of prescription, nonprescription medication and supplies which are permitted for use in the facility, correct?

A:      Not that I recall.

Q:      The only thing you're aware of is Dr. Kanoes [*sic*] simply stating that there is one, correct?

A:      That's correct, along with, you know, this policy I just referred to, when they would give the medical doctor the ability to determine what can come in and come out, that would be able to be given to the inmate.

. . .

Q:      Sure.  And that's on an individual basis. Now, it's my understanding of this policy this is more of a blanket rule, correct?  This is a blanket rule of which medications and supplies are permitted for use in the facility,

correct?

A:    That appears to be, yes.

Q:    Okay.  Under just this rule, I'm not asking on an individual basis, under this blanket rule, you're not aware of any instance or any listing or any listing or anything that would prohibit narcotics and/or OxyContin, correct?

A:    That's a correct assumption, yes.  I mean, I'm not aware of it.

Q:    And that would be true as it pertains to the time of the Clutters incident, correct?

A:    Yes.

Q:    So it would be safe to state that the entire time Carl Clutters was incarcerated at the Lawrence County Jail, you're not aware of any blanket policy prohibiting the use of OxyContin, correct?

A:    I'm not aware of any written policy, correct.  I mean --

Q:    Which would be in accordance with this policy and procedure, correct?

A:    Yeah.

(Lawless Depo. at 118-119, 120, 121-22)

Based on the foregoing testimony, the Court concludes that the Sheriff's written policy that the jail physician must establish and maintain a listing of prescription and nonprescription medications for use in the facility, in combination with Dr. Canos' own custom of not permitting narcotics in the Jail, shows that there is a genuine issue of material fact as to whether Defendants maintained a policy or custom of prohibiting all narcotics, regardless of a prescription, in the Jail.

The Eighth Amendment to the United States Constitution provides that: "Excessive Bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."  It is well established that "deliberate indifference to the serious medical needs

of prisoners" constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A plaintiff must show both "deliberate indifference" and "serious medical needs." *Id.* at 106.

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004) (citation omitted).[10] Defendants do not argue that Clutters did not suffer from a serious medical need. There is no dispute that Clutters was prescribed OxyContin by his physician to manage his pain.

Deliberate indifference has been defined as "more than mere negligence, but 'something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Foy v. City of Berea*, 58 F.3d 227, 232 (6th Cir. 1995), *quoting Farmer v. Brennan*, 511 U.S. 825 (1994). The Supreme Court has explained that the deliberate indifference standard contains both an objective component and a subjective component. *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir.1992), *citing Wilson v. Seiter*, 501 U.S. 294 (1991). The objective inquiry asks whether the deprivation was sufficiently serious. *Caldwell*, 968 F.2d at 602. The subjective inquiry asks whether the officials act with a sufficiently culpable state of mind. *Id.* A "sufficiently culpable state of mind" is one in which "the official knows of and disregards an excessive risk to inmate health or safety;

---

[10]As the Sixth Circuit noted in *Blackmore*, "[t]his 'obviousness' standard for determining a serious medical need is distinct from a separate branch of Eighth Amendment decisions where the seriousness of a prisoner's medical needs 'may also be decided by the *effect* of delay in treatment.' " 390 F.3d at 897 (emphasis in original). These decisions involve prisoner claims of delay in treatment that caused injury, loss, or handicap. *Id.* Plaintiff does raise this type of claim, but only as to the individual Defendants. Accordingly, the Court will address the applicable caselaw in that section of the Opinion.

the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official can be liable if he or she "disregards that risk by failing to take reasonable measures to abate it." *Id.* at 848. The Sixth Circuit has recognized that officials do not readily admit this subjective component, so "it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001); *see also Farmer*, 511 U.S. at 842 (explaining that in analyzing the subjective component of the deliberate indifference analysis, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

The Sixth Circuit has held that the denial of prescription medication can form the basis of a finding of deliberate indifference. In *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991), a prison nurse refused to give a prisoner his prescribed pain medication. The court noted that in *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976), the court held that a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering. *Id.* The court then noted that the Supreme Court in *Estelle* cited *Westlake* and stated that the unnecessary suffering which results from a denial of medical care is inconsistent with contemporary standards of decency. *Id.* at 1155, *citing* 429 U.S. at 103. Based upon the record before it, the court held that there were genuine issues of material fact as to whether the nurse wantonly interrupted a prescribed plan of treatment when she refused to provide pain medication. *Id.* at 1156; *see also Byrd v. Wilson*, 701 F.2d 592, 595 (6th Cir. 1983) (per curiam) (reversing district court which found that *pro se* prisoner's claim, based upon

failure of prison officials to provide him with his prescribed medication, was frivolous and subject to dismissal).

The Court concludes that even though Clutters ultimately died due to his head injury, there is evidence in the record that he was subjected to needless suffering as a result of the withdrawal of his pain medication.  Dr. Canos testified that it can be very difficult for a patient to withdrawal from OxyContin, and there can be serious medical consequences to the patient's health.  (Canos Depo. at 32, 43)  Dr. Canos testified that the withdrawal symptoms are similar to the withdrawal symptoms of Heroin.  (Id. at 75)  Therefore, there are genuine issues of material fact with regards to the seriousness of the pain and the withdrawal symptoms Clutters was experiencing.

The Court also finds that there are genuine issues of material fact as to the culpability of Defendants' state of mind.  Deputy Jones knew that Clutters was suffering from abdominal cramps and nausea, and was present during Dr. Canos' examination of Clutters.  (Jones Depo. 106-108)  Deputy Slack testified that on the night of October 2, 2004, Clutters was acting differently from when he had booked Clutters into the Jail.  (Slack Depo. at 52)  Instead of being quiet, he was louder and his tone of voice was "more intense." (Id.)  Deputy Van Keuren also testified that Clutters' behavior that night was different.  (Van Keuren Depo. at 130)  Deputy Van Keuren testified that at one point during the evening, there was a discussion among the deputies on duty that Clutters was experiencing withdrawal symptoms from some sort of medication.  (Id. at 148-49)[11]  The

[11]Included in the deposition exhibits submitted to the Court is a memo dated September 29, 2004 from Deputy Robert Bowles to Chief Deputy Lawless.  The memo reports that Clutters was taken to see Dr. Canos based upon complaints of vomiting and abdominal pain, and a request to be taken to the hospital.  The memo states that Clutters was seen by Dr. Canos, who diagnosed Clutters with "withdrawals."  The memo also states that after his visit with Dr. Canos,

Court finds that a jury could infer from this circumstantial evidence that Defendants had the requisite knowledge regarding the serious harm to Clutters as a result his pain or withdrawal from OxyContin.

The Court also finds that there is a genuine issue of material fact at to whether reasonable measures were taken to abate this risk of harm. Dr. Canos testified that the Jail does not provide any direct medical supervision of prisoners who are going through withdrawal. (Canos Depo. at 43) Dr. Canos also testified that on the night of October 2, 2004, none of the deputies called him, even though the deputies had the opportunity to call him if they deemed it necessary. (Id. at 122) Deputies Van Keuren and Williams testified that Deputy Jones has a pager which the deputies can use to contact him with medical issues. (Van Keuren Depo. at 52; Williams Depo. at 56) Van Keuren also testified that on other occasions he had contacted Jones when an inmate told him that he or she was on a certain medication and would go into withdrawal without it. (Id. at 59-60)

However, even if Plaintiff is able to establish a constitutional violation, Plaintiff must also show that there is direct causal link between that violation and the County's policy. As the Sixth Circuit explained in *Graham ex rel. Estate of Graham v. County of Washtenaw*, "[t]here must be 'a direct causal link' between the policy and the alleged constitutional violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violation." 358 F.3d 377, 384 (6th Cir. 2004), *citing Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001).

---

Clutters again requested to go to the hospital. When Bowles informed Clutters that he was not going to the hospital, Clutters stated that he was going to file a complaint in the morning for not getting him the medical attention that he needs. It is not clear whether this memo was ever received by Chief Deputy Lawless, and therefore the Court cannot afford it any weight for the purpose of showing the culpability of Defendants' state of mind.

In *Graham*, the county hired a company to provide medical care to prisoners in the county's jail. 358 F.3d at 379-380. The prisoner, Graham, had been brought to the jail after being arrested for possession of marijuana. *Id.* at 379. Unbeknownst to the arresting officer, Graham had swallowed an ounce of cocaine before being brought to the jail. *Id.* After Graham began walking and acting erratically, jail personnel asked him several times, "What did you take?" *Id.* Graham responded that he had smoked marijuana and drank alcohol, but did not reveal that he had ingested the cocaine. *Id.* A deputy requested that Graham be medically examined, and a nurse employed by the outside company examined Graham. *Id.* Again, Graham failed to reveal that he had ingested the cocaine when responding to the nurse's questions. *Id.* at 380. After Graham's cellmate yelled "He's hurt!" and pounded on the plexiglass window, the nurse responded again. *Id.* Graham still did not reveal that he had ingested the cocaine. *Id.* The nurse checked Graham's pulse, but apparently explained a high heart rate due to the marijuana. *Id.* Soon thereafter, Graham began to suffer seizures, and was transported to a hospital emergency room, where he died. *Id.*

Graham's estate argued that the contract between the outside company and the county created a policy of "automatic deference" by jail personnel to the company's medical staff with respect to decisions concerning prisoners' medical treatment; and the contract impermissibly allows licensed practical nurses make medical decisions which are beyond their competence under state law. *Id.* at 383.

The Sixth Circuit rejected both arguments and found that there was nothing in the county's policy which was actionable under section 1983. *Id.* at 384. The court noted that it was not unconstitutional for municipalities and their employees "to rely on medical

judgments made by medical professionals responsible for prisoner care." *Id.*, *quoting Ronayne v. Ficano*, No. 98-1135, 1999 WL 183479, at *3 (6th Cir. Mar. 15, 1999) (unpublished opinion). The court went on to explain that even assuming Graham suffered a constitutional violation, that violation "resulted from factors other than a faulty [County policy]." *Id.* at 384-85, *citing Canton v. Harris*, 489 U.S. 378, 390-91 (1989). The court pointed out that the allegations in the complaint focus primarily on the inadequacy of the medical treatment Graham received. *Id.* at 385. The court stated that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims in state tort law." *Id.*, *quoting Westlake*, 537 F.2d at 860, n.5. Because there was no evidence that the county's policy was the "moving force" behind Graham's constitutionally inadequate medical care, the court held that the county was entitled to summary judgment. *Id.*

The Court finds that the instant case is distinguishable from *Graham*. In *Westlake*, cited in *Graham*, the Sixth Circuit explained that there is a distinction "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Id.* at 860, n.5. While the adequacy of the treatment was challenged in Graham, the Court finds that the County's policy prohibiting all narcotics results in a complete denial of medical care. Because the County's policy does not permit any determination regarding an individual prisoner's medical need for a narcotic prescription, the policy has the effect of denying the prisoner medical treatment. Therefore, it was not any negligence or malpractice on the part of the deputies or Dr. Canos which caused the constitutional violation. Instead, it was the blanket

prohibition of all narcotics in the Jail which was the "moving force" behind the deprivation of Clutters' constitutional right to adequate medical care.  Therefore, the Court concludes that Defendants are not entitled to summary judgment on Plaintiff's section 1983 claim against the County based upon the County's policy or custom of prohibiting narcotics in the Jail.

### 2. Failure to train

The Supreme Court has held that "the inadequacy of police training may serve as the basis for section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  As this Court has explained, a municipality will be held liable where a plaintiff shows that (1) the training program at issue is inadequate to the tasks that officers must perform; and (2) the inadequacy is the result of the municipality's deliberate indifference; and (3) the inadequacy actually caused the plaintiff's alleged injury. *Kinkus v. Village of Yorkville*, 476 F.Supp.2d 829, 844 (S.D.Ohio 2007); *City of Canton*, 489 U.S. at 389-91.

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 397 (1997).  A showing of simple or even heightened negligence will not suffice.  *Stemler v. City of Florence*, 126 F.3d 856, 867 (6th Cir. 1997).  The Supreme Court has identified at least two types of situations that would justify a conclusion of deliberate indifference in the failure to train police officers:

> One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction.  For example, the Court indicated that the lack of instruction in the use of firearms or in the use of deadly force could constitute "deliberate indifference."  A second type of

situation justifying a conclusion of deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers.

*Games Galore of Ohio, Inc. v. Masminster,* 154 F.Supp.2d 1292, 1300 (S.D. Ohio 2001) (citations omitted).  Plaintiff has not presented any evidence of repeated complaints of constitutional violations, and therefore the Court will analyze Plaintiff's claim of failure to train in light of foreseeable consequences that could result from the lack of instruction.

Plaintiff points to the deposition testimony of Deputies Efaw, Slack, and Van Keuren which indicates that the officers did not receive training regarding the medical needs of inmates or the proper use of force.  (Efaw Depo. at 44; Slack Depo. at 20; Van Keuren Depo. at 64-65)[12]  Defendants have not provided any evidence to the contrary.  At most, Defendants have provided the affidavit of Defendant Tim Sexton, which states that disciplinary action would be taken against a deputy after it has been determined that the deputy used excessive force, or did not provide appropriate medical care to an inmate. (Doc. 56, Ex. B)

The Court finds that "[t]he need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers can reasonably be said to have been deliberately indifferent to the need." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 557 (6th Cir. 2003).  Certainly, the deputies working in the Jail would be faced with situations where they would be called upon to use force or handle the medical needs of inmates.  Therefore, the Court finds that the need for training was

---

[12]Slack testified that "there were several videos that I was offered to watch and I have watched those."  (Slack Depo. at 20)  Slack testified that he believed he was required to watch these videos.  (Id.)  Van Keuren testified that he had been provided some videos on what to look for in someone who is suicidal.  (Van Keuren Depo. at 33)

"obvious" and the lack of any training was likely to result in a constitutional violations.

However, Plaintiff must also be able to show that the inadequacy in training actually led to the injury. *City of Canton*, 489 U.S. at 391. The Parties have not addressed this specific issue. Presumably, Defendants would argue that Clutters' head injury was the result of an accident, and no amount of training could have prevented his fall. However, the Court finds that there is a genuine issue of material fact as to whether adequate training could have prevented Clutters' injury, regardless of whether it was an accident. For instance, Deputy Slack testified that when the deputies were transferring Clutters from the shower back to the tank, no special holds were used. (Slack Depo. at 65) Instead, the deputies were trying to hold his wrists and keep Clutters from pulling away from them. (Id.)

Likewise, the Court finds that there is a genuine issue of material fact as to whether adequate training could have prevented Clutters from suffering withdrawal symptoms, or would have led the deputies to recognize that Clutters' head injury needed treatment, regardless of the need for stitches. Therefore, the Court concludes that Defendants are not entitled to summary judgment on Plaintiff's section 1983 claim against the County based upon the County's failure to train its deputies working in the Jail regarding the medical needs of inmates or the proper use of force.

### D. Qualified Immunity

Defendants argue that they are entitled to qualified immunity against Plaintiff's section 1983 claims brought against them in their individual capacity.

The doctrine of qualified immunity protects government officials acting in their official capacities from damages if their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), *citing Procunier v. Navarette*, 434 U.S. 555, 565 (1978). Qualified immunity involves a two-step inquiry: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and if so, (2) whether that right was clearly established. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006), *citing Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no genuine issues of material fact exist as to whether the public official committed acts that would violate a clearly established constitutional right, summary judgment may be proper. *See Jackson v. Hoylman*, 933 F.2d 401, 403 (6th Cir. 1991) (finding that summary judgment was inappropriate on the issue of qualified immunity when two accounts of an arrest incident differed in all factual respects).

While the defendant bears the burden of pleading the defense of qualified immunity, the ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity. *Miller v. Administrative Office of Courts*, 448 F.3d 887, 894 (6th Cir. 2006), *citing Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

### 1.    Denial of medical care

Plaintiff claims Defendants violated the Eighth Amendment in denying medical care to Clutters. Plaintiff bases its claim on Defendants' delay in transporting Clutters to the hospital to have his head injury treated; and the failure of Defendants to provide Clutters with his prescribed OxyContin.

As stated previously, to establish a violation of the Eighth Amendment right to be free from "cruel and unusual punishments," an individual must demonstrate that the defendants acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. at 104-05. Deliberate indifference amounts to more than mere

negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

When a plaintiff claims that the delay in medical treatment amounted to a violation of the Eighth Amendment, the plaintiff must " 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.' " *Napier v. Madison Co., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001), *quoting Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1188 (11th Cir. 1994). However, "where a plaintiff's claims arise from an injury or illness 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' the plaintiff need not present verifying medical evidence to show that, even after the delayed necessary treatment, his medical condition worsened or deteriorated." *Blackmore*, 390 F.3d at 899-900. "Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.* at 900 (finding summary judgment inappropriate where plaintiff suffered for two days, making unrelenting complaints and vomiting, a nurse identified "classic signs of appendicitis," and doctors later performed an appendectomy).

Plaintiff argues that Clutters' head injury was such that there was an "obvious" need for medical treatment. In the alternative, Plaintiff argues that the delay in medical treatment for Clutters had a detrimental effect in that the delay was the direct and proximate cause of Clutters' death from the subdural hematoma.

The Court finds that the need to treat Clutters' head injury was not so obvious that a lay person would easily recognize the necessity for treatment. The deputies testified that Clutters was still alert after his head hit the concrete floor. Chandler, the paramedic who arrived on the scene, testified that the bleeding from Clutters' cut had stopped, and the cut

did not require stitches. Chandler also testified that Clutters was alert during his examination. Based upon this evidence, there was nothing "obvious" about Clutters' condition which would have indicated that his head injury needed medical treatment.

Nevertheless, Plaintiff has placed verifying medical evidence in the record to establish the detrimental effect of the delay in providing medical treatment for Clutters' head injury. Specifically, Plaintiff has submitted the affidavit of Dr. Elio Madan, which states that if the EMS had transported Clutters to the local emergency room after the first visit to the Jail, the subdural hematoma would have been identified and surgical intervention initiated. (Doc. 73, Ex. N, Madan Aff. ¶ 37) The record shows that the EMS offered transport, but the deputies refused. Based upon this evidence, the Court finds that there is a genuine issue of material fact as to whether Defendants were deliberately indifferent to Clutters need for medical treatment of his head injury.

Plaintiff also argues that Clutters had a serious medical need for OxyContin because it was prescribed by his physician, and it was clear that Clutters was going through OxyContin withdrawal before his death. The Court has already determined that there are genuine issues of material fact as to whether Defendants were deliberately indifferent to Clutters' need for his OxyContin medication to treat his chronic pain or the effects of the withdrawal of the drug on Clutters.

However, this finding does not apply to every Defendant which Plaintiff has named in his or her individual capacity. With regard to the subjective component of deliberate indifference to medical needs, this Sixth Circuit has explained that "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn by Parks v. Madison County Fiscal*

*Court*, 22 F.3d 653, 660 (6th Cir. 1994). Accordingly, a public official may not be held liable for the misconduct of those the official supervises unless the plaintiff can demonstrate that the official is culpable because he or she was personally involved in the allegedly inadequate medical care provided to the deceased or that he or she otherwise encouraged or condoned others in providing such inadequate medical care. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Plaintiff has not presented any evidence that any Defendant, other than Defendants Slack, Jones, Williams, Van Keuren, and Efaw, had personal involvement in the allegedly inadequate medical care provided to Clutters, or otherwise encouraged or condoned the other Defendants in providing such inadequate care. Accordingly, Defendants Sexton, Patterson, Malone, Stephens, Lawless, Sissler, Bowles, Bowman, and Milliston are entitled to summary judgment on Plaintiff's claims brought against them in their individual capacity for inadequate medical care.

However, even if the facts as alleged may establish a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, the remaining individual Defendants may still be "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Hope v. Pelzer*, 536 U.S. 730, 752 (2002).

The Sixth Circuit has held since 1976 that a prisoner has a cause of action against prison officials when his or her reasonable requests for medical treatment are denied and he or she is thereby exposed to undue suffering or the threat of tangible residual injury. *Westlake*, 537 F.2d at 860; *see also Farmer*, 511 U.S. at 834, (holding that a prisoner may bring a claim against a prison official if the prison official acted deliberately indifferent "to inmate health and safety."). Therefore, the Court concludes that a prisoner's right to

medical care was clearly established at the time Clutters was housed in the Jail.

Based on the foregoing, the Court concludes that neither Plaintiff nor Defendants Slack, Jones, Williams, Van Keuren, and Efaw are entitled to summary judgment on Plaintiff's claim of inadequate medical treatment.

### E. Excessive Force

Plaintiff argues that Defendants used unconstitutionally excessive force in violation of the Eighth Amendment when the deputies intentionally pushed Clutters.

When prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995), *cert. denied*, 515 U.S. 1116 (1995), *citing Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). However, "the maintenance of prison security and discipline may often require that prisoners be subjected to physical contact which at common law would be actionable as an assault." *Id.* A violation of the Eighth Amendment will nevertheless occur if the offending conduct "reflect[s] an unnecessary and wanton infliction of pain." *Id.*, *citing Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993).

Factors to consider in determining whether the use of force was wanton and unnecessary include the extent of injury suffered by an inmate, "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.' " *Combs v. Wilkinson*, 315 F.3d 548, 556-57 (6th Cir. 2002), *quoting Hudson*, 503 U.S. at 7. "[O]fficials confronted with a prison disturbance

must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Id.* at 557, *quoting Hudson*, 503 U.S. at 6.  Because prison officials "must make their decisions in haste, under pressure, and frequently without the luxury of a second chance," we must grant them "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal quotation marks omitted).

Plaintiff maintains that the video footage from the night of October 2, 2004 shows a deputy pushing Clutters backwards into the tank, which caused him to fall and hit his head on the floor.  Defendants argue that Clutter was not pushed, but instead slipped and fell.  The Court has viewed the video recording provided by Plaintiff and concludes that there is a genuine issue of material fact as to whether Clutters was pushed or accidentally fell to the floor, and whether the use of force was wanton and unnecessary.  Therefore, the Court finds that Defendants are not entitled to summary judgment on Plaintiff's claim of excessive force.

However, a supervisory official may not be held liable for an excessive use of force based upon the misconduct of those the official supervises unless the plaintiff demonstrates that "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002), *citing Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)*; see also Hardin v. Straub*, 954 F.2d 1193, 1196 (6th Cir. 1992) (prison official cannot be held liable under section 1983 in his or her individual capacity where plaintiff failed to show personal involvement of official). Plaintiff has not presented any evidence that any Defendant, other than Defendants Slack,

Williams, and Van Keuren, had personal involvement in the alleged use of excessive force Clutters, or encouraged the use of force against Clutters.  Accordingly, Defendants Sexton, Patterson, Malone, Stephens, Lawless, Jones, Sissler, Bowles, Bowman, Efaw, and Milliston are entitled to summary judgment on Plaintiff's claims brought against them in their individual capacity for excessive use of force.

As to whether the prohibition of use of excessive force was "clearly established," the Court finds that at the time of the incident, it was clearly established that the unnecessary and wanton infliction of pain constituted cruel and unusual punishment forbidden by the Eighth Amendment.  *See Haynes v. Marshall*, 887 F.2d 700, 703 (6th Cir. 1989).

Therefore Defendants Slack, Williams, and Van Keuren are not entitled to summary judgment on Plaintiff's claim of excessive force brought against them in their individual capacities.

### F.    Cruel and unusual punishment

Plaintiff argues that Defendants violated Clutter's constitutional right to be free from cruel and unusual punishment by forcing him to remain nude; and forcing him to into a restraining chair.  Defendants have not addressed this claim in their Motion for Summary Judgment.

The Eighth Amendment requires prison officials to provide humane conditions of confinement, such as adequate food, clothing, shelter, and medical care.  *Farmer*, 511 U.S. at 832, *citing Hudson*, 468 U.S. at 526-527.  A conditions of confinement claim contains both an objective and subjective component.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Under the objective component, the plaintiff must show that the conditions deprived the plaintiff of "the minimal civilized measures of life's necessities." *Rhodes v. Chapman*, 452

U.S. 337, 347 (1981). Extreme deprivations are required to make out a conditions-of-confinement claim because routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), *quoting Rhodes*, 452 U.S. at 347. Under the subjective component of a conditions of confinement claim, a plaintiff must show that the defendant prison officials were "deliberately indifferent" to the deprivations of his or her needs. *Wilson*, 501 U.S. at 298; *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992). Officials act with deliberate indifference if they know of a substantial risk to an inmate's safety, yet disregard that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 837.

The Supreme Court has held that a sufficiently serious deprivation might be found where an inmate is subjected to a low cell temperature at night, not provided blankets, and deprived of his basic need for warmth. *Wilson*, 501 U.S. at 304; *but see Harris v. Hulkoff*, 2007 WL 2479467, *4 (W.D.Mich. 2007) (slip op.) (summary judgment granted where plaintiff alleged that he subjectively felt cold, but did not present evidence indicating that cells were objectively so cold as to present a health risk to persons confined in them). The Court finds that there are genuine issues of material fact as to whether confining Clutters to the restraint chair for a period of almost two hours without allowing him an opportunity to get up to stretch or use the bathroom was an extreme deprivation. The Court notes that there is no evidence that Clutters was in danger of harming himself or others. Instead, Clutters was placed in the restraint chair to make room for another prisoner in the tank. Based on the foregoing, the Court finds that Plaintiff has met the subjective component of a conditions of confinement claim by showing that the conditions deprived Clutters of the minimal civilized measures of life's necessities.

As to the subjective component, the Court finds that construing the facts in a light most favorable to Plaintiff, Defendants knew of a substantial risk to Clutters' safety, yet disregard that risk by failing to take reasonable measures to abate it.

However, Plaintiff has not presented any evidence that any Defendant, other than Defendants Slack, Williams, and Van Keuren had personal involvement in, or encouraged the alleged cruel and unusual punishment. Accordingly, Defendants Sexton, Patterson, Malone, Stephens, Lawless, Jones, Sissler, Bowles, Bowman, Efaw, and Milliston are entitled to summary judgment on Plaintiff's claims brought against them in their individual capacity for cruel and unusual punishment.

Finally, the Court finds that at the time of the incident, it was clearly established that such deprivations of the minimal civilized measures of life's necessities constituted cruel and unusual punishment in violation of the Eight Amendment. Therefore, the Court concludes that Defendants Slack, Williams, and Van Keuren are not entitled to summary judgment on Plaintiff's claim of cruel and unusual punishment.

### G. State law claims

Plaintiff also brings state law claims of assault and battery, intentional infliction of emotional distress, abuse of process, and wrongful death.

### 1. Immunity under Ohio Revised Code § 2744.02

Defendants argue that the state law claims against them in their official capacity, which are treated as claims against the County itself, should be dismissed because the County is entitled to sovereign immunity under Ohio Revised Code § 2744.02. Defendants argue that the state law claims against them in their individual capacity are likewise barred.

This Court has held that this provision violates Section 5, Article I and Section 16,

Article I of the Ohio Constitution.  *Kammeyer v. City of Sharonville*, 311 F.Supp.2d 653, 662 (S.D.Ohio 2003).  However, other judges within this district have held that the provision is not violative of the Ohio constitution.  *See Webb v. Greene County Sheriff's Office*, 494 F.Supp.2d 779, 797 (S.D.Ohio 2007); *Samples v. Logan County*, 2006 WL 39265 (S.D.Ohio Jan. 6, 2006) (unpublished); *Grant v. Montgomery County Job & Family Servs.*, 2005 WL 2211266 (S.D.Ohio Sept. 8, 2005) (unpublished).  The Court finds the rationale of these opinions persuasive, and holds that Ohio Revised Code § 2744.02 does not violated the Ohio constitution.

Ohio courts have consistently held that political subdivisions, particularly those acting in a governmental capacity, are exempt from intentional tort claims, reasoning that Ohio Rev.Code § 2744.02(B) does not provide a specific exception for intentional torts. *Woods v. Miamisburg City Schools*, 254 F.Supp.2d 868, 880 (S.D.Ohio 2003).  Likewise, this Court concludes that the County is entitled to immunity from Plaintiff's intentional tort claims of assault and battery and intentional infliction of emotional distress

As to the state law claims against the Defendants in their individual capacity, Plaintiff argues that its claims fall within one of the statutory exceptions.  Specifically, Plaintiff argues that the exception for "acts or omissions with malice purpose, in bad faith, or in wanton or reckless manner" is applicable.  *See* Ohio Rev. Code 2744.03(A)(6)(b).  Defendants have argued that they were not reckless in moving Clutters from the shower to the tank, and the deputies called the EMS after Clutters hit his head.

The issue of whether a government employee acts with malice, bad faith, or in a wanton or reckless manner is a question for the jury. *Barrett v. Outlet Broadcasting, Inc.*, 22 F.Supp.2d 726, 750-51 (S.D.Ohio 1997).  This Court has recognized that Ohio courts

have defined "reckless conduct" in this context as referring to:

> an act done with knowledge or reasons to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent. The term "reckless" is often used interchangeably with the word "wanton" and has also been held to be a perverse disregard of a known risk.

*Culberson v. Doan*, 125 F.Supp.2d 252, 284 (S.D.Ohio 2000), *quoting Caruso v. State*, 737 N.E.2d 563, 567-68 (Ohio Ct. App. 2000). Construing the facts in a light most favorable to Plaintiff, the Court finds that this exception is applicable, and the individual Defendants are not entitled to sovereign immunity under Ohio Revised Code § 2744.02.

### 2. Assault and battery

Under Ohio law, an assault is "the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." *Smith v. John Deere Co.*, 614 N.E.2d 1148, 1154 (Ohio Ct. App. 1993). The "threat or attempt must be coupled with a definitive act by one who has the apparent ability to do the harm or to commit the offensive touching. An essential element of the tort of assault is that the actor knew with substantial certainty that his or her act would bring about harmful or offensive contact." *Id.* at 1154. In Ohio, one is liable for battery when she or he acts intending to cause a harmful or offensive contact, and when a harmful contact results. *Love v. City of Port Clinton*, 524 N.E.2d 166, 167 (Ohio 1988). The Court finds that there are genuine issues of material fact as to whether the actions of Defendants Slack, Williams, and Van Keuren against Clutters constituted an assault or battery. Therefore, Defendants are not entitled to summary judgment on Plaintiff's claims of assault and battery.

### 3. Intentional infliction of emotional distress

Under Ohio law, " '[o]ne who by extreme and outrageous conduct intentionally or

recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.' " *Yeager v. Local Union 20*, 453 N.E.2d 666 (1983) (citing Restatement (Second) of Torts 77 § 46(1) (1965)).  As this Court recognized in *White v. Honda of America Mfg., Inc.*, 191 F.Supp.2d 933, 955 (S.D. Ohio 2002), both the Ohio Supreme Court in *Yeager* and the Sixth Circuit in *Polk v. Yellow Freight System*, 801 F.2d 190 (1986), have adopted the standard set forth in comment d to Section 46 of the Second Restatement of Torts for determining whether the "extreme and outrageous" requirement has been met:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

Plaintiff has not presented any evidence that Defendants Sexton, Patterson, Malone, Stephens, Lawless, Sissler, Bowles, Bowman, or Milliston took any intentional acts against Clutters.  However, the Court finds that there is a genuine issue of material fact as to whether the remaining Defendants' conduct meets the "extreme and outrageous" requirement.  Therefore, Defendants Van Keuren, Williams, Slack, Jones, and Efaw are not entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress.

### 4.    Abuse of process

Under Ohio law, the elements of abuse of process are as follows: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the

proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Frank Robb v Chagrin Lagoons Yacht Club, Inc.*, 662 N.E.2d 9 (Ohio Ct. App. 1996). Plaintiff has not presented any evidence that Defendants instituted a legal proceeding against Clutters. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim for abuse of process.

### 5. Wrongful death

In Ohio, section 2125.01 of the Ohio Revised Code creates a cause of action for wrongful death:

> When the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued, the person who would have been liable if death had not ensued, or the administrator or executor of the estate of such person, as such administrator or executor, shall be liable to an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances which make it aggravated murder, murder, or manslaughter.

Ohio Rev. Code § 2125.01. Given the Court's above ruling on Plaintiff's claim for assault and battery, the Court finds that Defendants are not entitled to summary judgment on Plaintiff's claim for wrongful death.

### H. Punitive Damages

Defendants argue that under federal law, punitive damages unavailable against a municipality. Defendants also argue that the County is immune from punitive damages pursuant to Ohio Revised Code § 2744.05(A). As this Court has previously recognized, Ohio and federal law are both clear in that no claim or punitive damages can be made against a municipality. *Culberson v. Doan*, 125 F.Supp.2d 252, 282 (S.D.Ohio 2000), citing

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 261 n. 20 (1981). Plaintiff does not argue to the contrary. Therefore, Defendants are entitled to summary judgment on any claim for punitive damages against the County based upon Plaintiff's section 1983 claim or claims under Ohio law.

### I.   **Unnamed Defendants**

Plaintiff's claims are brought against John Doe Companies, John Doe Sheriff Departments, John Doe Lawrence County Deputies, John Doe Government Entities, and John Doe Government Employees. However, discovery in this matter has been completed and Plaintiff has not amended the Complaint a second time to identify the unnamed defendants. Therefore, the claims against the unnamed defendants will be dismissed. *Accord Haddad v. Fromson*, 154 F.Supp.2d 1085, 1093 (W.D.Mich. 2001); *Cornett v. Webb*, 2004 WL 3437504, *8 (E.D.Ky. 2004).

### III.   **CONCLUSION**

Based on the foregoing, the following claims of Plaintiff remain: (1) claim of denial of medical care based upon policy or custom prohibiting prescribed narcotics against the Defendants in their official capacity, which is construed as a claim against the County; (2) claim of failure to train against the Defendants in their official capacity, which is construed as a claim against the County; (3) claim of denial of medical care based upon delay in transporting Clutters to the hospital and failure to provide OxyContin against Defendants Slack, Jones, Williams, Van Keuren, and Efaw in their individual capacity; (4) claim of excessive force against Defendants Slack, Williams, and Van Keuren in their individual capacity; (5) claim of cruel and unusual punishment against Defendants Slack, Williams, and Van Keuren in their individual capacity; (6) claim of assault and battery against

Defendants Slack, Williams, and Van Keuren in their individual capacity; (7) claim of intentional infliction of emotional distress against Defendants Van Keuren, Williams, Slack, Jones, and Efaw in their individual capacity; and (8) claim of wrongful death against Defendants Slack, Williams, and Van Keuren in their individual capacity.

Accordingly, it is hereby **ORDERED** that:

1. Defendants' Motion for Summary Judgment (Doc. 56) is **GRANTED in PART** and **DENIED in PART**;

   a. Defendants' Motion is granted to the extent that the claims brought against Defendants Sexton, Patterson, Malone, Stephens, Lawless, Sissler, Bowles, Bowman, and  Milliston in their individual capacity for inadequate medical care are dismissed;

   b. Defendants' Motion is granted to the extent that the claims brought against Defendants Sexton, Patterson, Malone, Stephens, Lawless, Jones, Sissler, Bowles, Bowman, Efaw, and Milliston in their individual capacity for use of excessive force are dismissed;

   c. Defendants' Motion is granted to the extent that the claims brought against Defendants Sexton, Patterson, Malone, Stephens, Lawless, Jones, Sissler, Bowles, Bowman, Efaw, and Milliston in their individual capacity for cruel and unusual punishment are dismissed;

   d. Defendants' Motion is granted to the extent that all state law claims brought against Defendants in their official capacity are dismissed;

   e. Defendants Motion is granted to the extent that the claims brought against Defendants Sexton, Patterson, Malone, Stephens, Lawless, Sissler, Bowles, Bowman, and Milliston in their individual capacity for intentional infliction of emotional distress are dismissed;

   f. Defendants' Motion is granted to the extent that Plaintiff's claim for abuse of process is dismissed;

   g. Defendants' Motion is granted  to the extent that Plaintiff's claim for punitive damages against the County is dismissed;

   h. Defendants Motion is denied in all other respects;

2. Plaintiff's Motion for Partial Summary Judgment (Doc. 57) is **DENIED**; and

3.    Plaintiff's claims against John Doe Companies, John Doe Sheriff Departments, John Doe Lawrence County Deputies, John Doe Government Entities, and John Doe Government Employees are hereby **DISMISSED without PREJUDICE**.

**IT IS SO ORDERED.**

                                          *S/Michael R. Barrett*
                                    Michael R. Barrett, Judge
                                    United States District Court